

# The Peregrine Corporation

## Specialists in Defense Dynamics

July 12, 2023

Phillip A. Noblett, Esq.
Chattanooga City Attorney
Office of the City Attorney
100 East 11th Street, Suite 200
Chattanooga, TN 37402

Re:  <u>Jenkins v. City of Chattanooga, et al.</u>

Dear Attorney Noblett:

I am writing to provide my report in the above-referenced matter.

**Preparation.**  In preparation, I have reviewed a volume of materials provided by your office, including but not limited to Plaintiff's Complaint; Plaintiff's Rule 26 Expert Disclosures;Chattanooga Police Department ("CPD") Additional Narratives; Autopsy ("Postmortem Examination") and related Medical Examiner's documents; NMS Labs toxicology reports; determination by District Attorney General Neal Pinkston; news articles about the incident; administrative determinations regarding the actions of the three involved officers, and related documents; Police Advisory and Review Committee recommendation forms; Professional Standards summary of the incident; CPD Report of Investigation, including notes of officer interviews and investigative summary; body-worn camera ("BWC") video/audio of involved officers, including Officer Blumenberg and Officer Martin; freeze-frame photos from BWC videos; Expert Report of Dr. Glen E. Farr, PharmD; criminal history of Mykel Jenkins; police calls for service information at 3624 Premium Drive, Chattanooga; Hamilton County Sheriff's Office investigative documents, including written Crime Scene Unit report, scene photographs, and scene diagram;  evidence photographs; taped interviews of involved officers; neighborhood canvass reports; CPD Use of Force Policy; officer training records; officer medical records; and Tennessee Code Annotated sections regarding use of force and use of deadly force by law enforcement officers.

**Qualifications for Rendering Opinions.**  In addition to the above, for approximately the past 45 years I have been a professional trainer and instructor-trainer (an "instructor-trainer" being one who trains and certifies others to be instructors) on a nationwide basis in fields including firearms, use of force, police training and tactics, and evaluation of use of force incidents.  During that time, I have trained some 17,000 students, including law enforcement officers and instructors, security and military personnel, and others. I have taught use of force to police recruits, in-service law enforcement officers, law enforcement instructors, tactical teams,

1636 N. Cedar Crest Blvd. #320 • Allentown, PA 18104 • peregrine@ptd.net • 610-360-7053

federal agents, criminal justice students on the university level, and to attorneys, prosecutors and judges, among others.

I have been certified as a law enforcement firearms instructor and/or use of force instructor by the FBI, the NRA (for multiple weapons types, including handgun, shotgun, patrol rifle, fully automatic weapons, and counter-sniper rifle), Glock, H&K, the New Jersey Police Training Commission, the Pennsylvania Municipal Police Officers Education & Training Commission ("MPOETC"), and others.

Law enforcement agencies for which I have trained officers or instructors include the police departments of Philadelphia, Baltimore, Miami, Jacksonville, St. Petersburg, Phoenix, Seattle, Tacoma, Trenton, Atlantic City, Jersey City, Dallas, the Washington D.C. Metropolitan Police, Calgary Police Service Tactical Unit, Toronto Metropolitan Police Emergency Task Force and Dignitary Protection Unit, Massachusetts Metropolitan Police, Louisiana State Police, Oregon State Police, Missouri Highway Patrol, San Francisco Sheriff's Office, Salt Lake County Sheriff's Office, and many others. Since the mid-1980s, I have been a presenter at numerous regional, national and international law enforcement training conferences, including conferences held by the International Association of Law Enforcement Firearms Instructors ("IALEFI"), the American Society of Law Enforcement Trainers ("ASLET"), the International Law Enforcement Educators & Trainers Association ("ILEETA"), the North Carolina Justice Academy, and others. I have served on the Board of Directors of IALEFI for the past 36 years, and for approximately ten years have been that organization's First Vice President.

I have assisted the Pennsylvania MPOETC in writing the firearms and use of force curriculum used to train recruits at police academies in Pennsylvania for some 18 years. I was one of the four subject matter experts who wrote the MPOETC's Patrol Rifle Guidelines, distributed to and used by law enforcement agencies throughout Pennsylvania. I was also one of the subject matter experts who developed, and then trained instructors to teach, the MPOETC's mandatory in-service training program, "Police Use of Force," presented to some 24,000 law enforcement officers statewide in 2016.

I taught the curriculum segment entitled "Use of Force in Law Enforcement" in the recruit training program at the Allentown, Pennsylvania Police Academy for about seven years. The principles governing the justifiable use of force in Pennsylvania are very similar to those of Tennessee, as they are largely governed by federal law, and are therefore similar in major part throughout the United States.

I developed and taught a senior seminar entitled "Police Use of Force" in the Criminal Justice Department of Indiana University in Bloomington, Indiana, for two years while I lived in Indiana.

I taught use of force law and tactics in a two-and-a-half-year series of classes for Senior Firearms Instructors of the federal Bureau of Alcohol, Tobacco & Firearms, presented at various locations on the East and West Coasts including San Diego, Orlando, San Francisco, and Los Angeles.

Case 1:22-cv-00069-DCLC-CHS   Document 29-11   Filed 10/02/23   Page 2 of 19   PageID #: 555

In Tennessee I have conducted a firearms instructor class for the Tennessee Bureau of Investigation, and taught at, and helped to conduct, an IALEFI Annual Training Conference in Nashville. I have testified as an expert witness in a police shooting case in the U.S. District Court for the Eastern District of Tennessee in Knoxville, and in a firearms case in Williamson County. I have also worked as an expert in a police shooting case for the City of Nashville, and in several cases for Hamilton County, in cases that did not go to trial or are still pending.

I have served as a sworn, armed reserve deputy sheriff for 24 years in sheriff's departments in the two states where I have lived during those years. I have hands-on experience in a wide range of law enforcement situations, including prisoner transports, traffic control and enforcement, response to calls for service, response to crimes in progress, vehicular and foot pursuits, service of search warrants and arrest warrants, and barricaded gunman situations, up to and including the pursuit and arrest of armed robbery suspects at gunpoint. In my service as a deputy sheriff I have carried various handguns, shotguns, patrol rifles, batons, pepper spray, and Taser.

I have written and assisted in writing firearms and use of force policies for my sheriff's department and other agencies, and have for some 20 years chaired our sheriff's department's shooting review boards, reviewing and making determinations following officer-involved shootings. I have also consulted on other uses of force by our deputies, not involving firearms.

One of my recent consulting engagements was to organize, train and write use of force policy for an armed, proprietary security team for a regional health care provider, operating multiple hospitals and serving some two million patients annually. Another recent security consulting engagement was to perform similar work for a multi-billion-dollar public utility company, operating in several states.

In addition to my multiple certifications as a law enforcement firearms instructor, I have been certified as an instructor in defensive tactics, defensive tactics being unarmed self-defense and subject control as taught to police officers. I have also been certified as an instructor in baton (for several types of police batons), pepper spray, less lethal impact munitions, and weapon retention. Weapon retention is the system by which an officer retains, or regains, control of his or her weapon when an assailant is attempting to disarm the officer. I have also been certified by Taser International as a Taser Master Instructor, have been recertified as a Taser instructor, and have been certified by my sheriff's department as a Taser user. I have been licensed as an Executive Protection Specialist. I have been trained in various unarmed self-defense and fighting techniques. I have testified as an expert witness in cases in which officers attempting to control or arrest resisting subjects have used defensive tactics, pepper spray, baton and Taser.

I am certified in shooting scene reconstruction, and have testified for years on shooting scene reconstructions, including component aspects such as ballistics, trajectories, wound paths in the human body and what these wound paths indicate about the position of the body when the wound was created, cartridge case ejection patterns, muzzle-to-target proximity and proximity testing, projectile damage to various objects, projectile penetration and ricochets, firearms function, functionality, and defects, etc. I have both studied and taught wound ballistics for many years, have done extensive ballistic testing using ballistic gelatin of various types and

3

formulations, have read and analyzed hundreds of autopsy reports and tens of thousands of pages of medical records and photographs of gunshot wounds, have seen gunshot wounds first hand in the field, have worked in hundreds of cases involving gunshot wounds in which I have reviewed medical, photographic, electronic and other evidence, and have inspected hundreds of projectiles removed from bodies at autopsies, in hospital surgeries, or recovered at incident scenes after passing through bodies.

I am certified as a Force Science Analyst, and as an Advanced Specialist in Force Science. I studied, taught, and testified about force science issues for several decades before the term "force science" was even coined or came into common usage. The field of force science is the application of scientific principles, research and testing to confrontations involving the use of force by police or others. Force science involves human factors elements such as reaction time to various stimuli, the speed with which one can cover a certain distance on foot, or turn, or draw and/or fire a gun, the speed with which multiple shots can be fired, and the relative speed of one individual's action compared to another individual's ability to react to it. Force science also involves the physical and perceptual changes that occur in high-stress use of force incidents, commonly called the "fight or flight syndrome," or more properly "body alarm reaction" or "BAR." These stress-caused reactions have been studied for years, are the subject of many scientific publications, journal articles, and texts, and include such things as tunnel vision, auditory exclusion (also called "auditory blunting" in some of the scientific literature), and other perceptual narrowing or gating. These force science issues have been part of the curriculum in many police firearms instructor courses for years, as well as in many officer-level courses, and a knowledge of these factors is essential for the development and selection of the tactics and use of force techniques that officers must use in life and death confrontations. I have taught these subjects myself in classes ranging from the police academy recruit level, to the police instructor and university levels. I have attended many presentations and classes on these stress effects taught by police investigators, psychologists, medical doctors, scientists and other leading researchers in this field. I have experienced some of these stress reactions myself, have interviewed or debriefed many other officers who have experienced them in deadly force confrontations, and have worked and testified in many cases involving these subjects. I have also helped develop the curriculum on this subject used in police training, at the recruit level through the instructor level, in the Commonwealth of Pennsylvania.

This case involves important video evidence of the incident, in the form of officers' body camera videos. I have been trained in the analysis of electronic evidence (video and audio), both in a two-day Force Science Institute class on that subject in Chicago, and in other programs I have attended. I have analyzed video evidence of police use of force incidents since a 1994 fatal shooting of a man at the White House, in which I worked as an expert for the U.S. Department of Justice. In recent years, over 50% of the police use of force cases in which I work as an expert involve video evidence, whether from dashcams, body cameras, intersection cameras, Ring doorbell cameras, security cameras on or in buildings, or videos taken by witnesses using their cell phones. Often there are multiple videos of the same event, taken from different angles and distances. I have testified as an expert in cases, including nationally high-profile cases, about my analysis of both video and audio evidence of what occurred. I have taught about the analysis and use of video evidence in many of my instructor-level law enforcement classes, and to criminal justice majors at the university level.

4

I have served as an expert in many cases involving issues of de-escalation. I have studied, taught, and testified about de-escalation of potentially violent incidents. As a deputy sheriff I have been involved in situations in which de-escalation techniques have been used. I am certified as a Realistic De-Escalation Instructor.

This case involves Officer Blumenberg's use of a Taser in an attempt to incapacitate and control Jenkins. As mentioned above, I have been certified as a Taser Master Instructor, attended updated Taser Instructor training, and qualified to carry a Taser on duty by my sheriff's office. I own a Taser, provided to me for training and evaluation purposes by the manufacturer. I have been both drive stunned and probe stunned, and have seen dozens of others stunned by Tasers. I have testified as an expert witness in several cases, including federal court cases, in which subjects have been tased by police, with varying results. My knowledge of Taser informs my opinions in this case.

This case involves Jenkins' threatening the police with both a pointed weapon and a folding pocketknife. I have carried knives on more or less a daily basis for over 60 years. This includes utility knives, defensive knives, hunting knives, backpacking knives and rescue knives, which I have carried both on duty with my sheriff's departments and while off duty. I have built several high-quality knives and have made knife sheaths. In addition to the many defensive tactics classes and instructor-certification courses I have completed which have addressed knives, knife threats, and knife defense among other subjects covered, I have attended a number of classes devoted entirely to knife fighting and knife defense, including Realistic Knife Defense (IALEFI, New York, 1993); Edged Weapons (IALEFI, Phoenix, 1999, Lynn Thompson, Instructor); Warrior Arts Seminar, Stick and Knife Fighting (Al McLuckie, Instructor, Leesport, PA, 2004); Officer Involved Shooting, Marcus Young, Presenter (IALEFI, Reno, NV 2005); Mastering the Defensive Folding Knife (Michael de Bethencourt, Instructor, Hellertown, PA 2007); Knife Defense/Knife Fighting Seminar (2013, Allentown, PA, Hank Hayes, No Lie Blades, Instructor – course audited only, due to injury); Defensive Knife (2015 ILEETA Conference, Wheeling, IL, Halleck); and Tactical Duty Knife, 2017 ILEETA Conference, St. Louis, MO (Fletch Fuller, Instructor). I have testified as an expert witness in numerous cases involving knives, knife defense, and the threat posed by knives and other edged and pointed weapons. I have used knife points to break car windows, and have worked in a case where a shard of broken glass was used as a weapon. I have carried metal ballpoint pens and tactical pens for self-defense, and have myself been threatened by someone clenching a ballpoint pen in his hand. I have taught on this subject myself for many years, including teaching in instructor-level courses and in criminal justice training classes. I last addressed this topic in simulation training exercises I conducted for security officers this past weekend. My knowledge of edged and pointed weapons, including their use, the threats they pose, methods to defend against them, and standard law enforcement training about these weapons, all inform my opinions in this case, and allow me to educate the jury in these matters.

This case involves Officer Blumenberg's use of a Sig Sauer Model P320, 9mm semiautomatic pistol. I own several of these pistols, both in the full-size and in the compact versions, and I have trained and qualified many law enforcement officers and others in the use of

5

this pistol model. I believe my familiarity with this model of pistol informs my opinions in this case, and will help me testify authoritatively on any issues involving this firearm.

More generally, I have testified as an expert witness in use of force cases on a nationwide basis for the past 40 years. In total, I have served as an expert in over 400 cases, and have testified nearly one hundred (100) times at trials in state and federal courts throughout the United States, in addition to testimony before grand juries, police boards, arbitration panels and administrative tribunals, city and state legislative committees, and by invitation before committees of both Houses of the United States Congress. I have been qualified as an expert by state courts, and have testified as an expert, in California, Connecticut, New York, New Jersey, Pennsylvania, Delaware, Maryland, Tennessee, West Virginia, Georgia, Florida, Louisiana, Arizona, Wisconsin, Michigan, Minnesota, Ohio, Illinois, Iowa, Kentucky, and Mississippi, and federal courts in California, Connecticut, New York, New Jersey, Pennsylvania, Maryland, Tennessee, Louisiana, Arkansas, Florida, Illinois and Oregon. In total I have been qualified and have testified as an expert in some 14 federal courts in 12 states, and in 46 state courts in 21 states, as well as in the District of Columbia. As listed above, this includes both state and federal courts in Tennessee. In some instances, I have testified in multiple cases before the same court. I have also served as an expert in many other cases that have settled, plea bargained, been dismissed or withdrawn, or for some other reason have not required my trial testimony, in 23 other states, the U.S. Virgin Islands, and Canada.

Because of my wide-ranging background, and because I have taken cases and testified as an expert both for and against law enforcement officers and law enforcement agencies, I have many times been asked by prosecutors to evaluate police use of force incidents to advise the prosecutors whether the use of force was justified, and whether criminal charges should or should not be brought against the involved officer(s). As an example, I recently worked in the criminal prosecution of a police officer in Nashville, in which I opined that a fatal police shooting was not justified, and the officer's description of what occurred was not accurate.

Further details of my training, experience and qualifications are contained in my curriculum vitae, provided with this report.

**Summary of the Incident.** Without attempting a comprehensive recitation, but rather to give a brief summary of the incident sufficient to allow the reader to place the rest of this report in context, the following account of the incident is provided here. The details of this account are taken, among other sources, from the written file, and from the body-worn camera ("BWC") videos of Officer Blumenberg and Officer Martin.

On Friday, March 19, 2021, shortly after 1:00 a.m., CPD officers responded to a call at 3624 Premium Drive in Chattanooga, Tennessee. Mrs. Jenkins, the plaintiff in this case, advised that her 29-year-old son, Mykel Jenkins ("Jenkins"), was destroying her room and was displaying erratic and aggressive behavior. The police had been to that address many times, and had dealt with Jenkins many times, as he had an ongoing substance abuse problem, and would sometimes wield weapons and become destructive, threatening and violent. According to the Hamilton County Sheriff's Office investigative file, Jenkins had on prior occasions assaulted his mother, vandalized the house, broken windows of a car parked on the street near their house, and

6

committed various acts of domestic disturbance. On this occasion, officers reported that Jenkins appeared agitated and possibly on narcotics. On the BWC videos, Mrs. Jenkins can be heard to tell the officers that Mykel "just got out of jail last week," and that "he's got some kind of drug in him" Officer Blumenberg reports that Jenkins was tossing beer cans around the bedroom, and grabbing pens, a phone cord, and other objects. Blumenberg heard Jenkins say it would take more than two officers to get his hands behind his back (i.e., for handcuffing). Blumenberg says it appeared Jenkins was ready to fight the officer. The officers learned from Mrs. Jenkins that Jenkins was in violation of a TPO that was part of the terms of his release from jail for his previous offense by being at his mother's residence, and decided to arrest Jenkins. She also told the police that Jenkins had stolen her copy of the TPO. Due to Jenkins' behavior, the officers called for additional officers to respond to assist them in taking Jenkins into custody. When backup Officers Timmons and Vrandenburgh arrived, Officers Martin and Blumenberg entered the bedroom where Jenkins was, while the other officers remained in the hallway. While the officers were speaking with Jenkins in an apparent attempt to gain his cooperation and de-escalate the situation, Jenkins grabbed a pointed object, and threatened to attack them. Officer Vrandenburgh said he heard Officers Blumenberg and Martin in the bedroom saying "Come on man, just put it down, we'll get you some help." The audio on the officers' BWC recordings evidence the officers saying things like "Come on Mykel – work with us here," "Let's get you some help," "Mykel, come on, don't break your mother's stuff," and other thinks in an effort to gain Mykel's cooperation and avoid having to use force. Officer Vrandenburgh said he could see Jenkins swinging and flailing with his arms, and this is apparent on the BWC videos. Vrandenburgh could see Jenkins had something in his hand, but he could not tell exactly what it was. Officer Timmons observed Jenkins "acting frantically like he was on drugs," and states that the object he saw Jenkins grab had a piece of metal sticking out like a screwdriver. Officer Blumenberg says he saw Jenkins come very close to Officer Martin, and heard Jenkins ask Martin if he wanted it (i.e., the weapon he was holding) in his left eye or his right eye, and then stated he would do both eyes. Body camera video of the incident shows Jenkins in an aggressive posture, with a pointed object, perhaps 7-8" long, clenched in his right hand, standing face to face with Officer Martin. Officer Blumenberg stated he believed Jenkins was armed with a pointed metal object, and saw that Jenkins was now standing very close to Officer Martin and threatening to stab Martin in the eyes. Officer Timmons went to his car and returned with his police K-9. When Jenkins saw the K-9, he began to bark at it. Officer Blumenberg then drew his Taser, and ordered Jenkins to drop the weapon he was holding, but Jenkins did not do so. Officer Blumenberg then discharged his Taser at Jenkins, and saw the probes make contact with Jenkins' right torso. Although the probes hit Jenkins in his right side and Jenkins initially yelled "ow, ow!" and stumbled backwards, Jenkins was not incapacitated by the Taser. Seeing that the Taser was ineffective, Officer Blumenberg pulled the Taser trigger again, but the second Taser discharge was also ineffective. As Officers Martin and Vrandenburgh moved toward Jenkins to take him into custody, Jenkins suddenly came toward them, with the pointed weapon still in his hand, making slashing and stabbing motions. Officer Martin attempted to front kick Jenkins, but Jenkins grabbed Martin's leg. Officer Blumenberg stated he fired his service pistol at Jenkins when he saw Jenkins coming at Officer Martin, swinging his arms in an apparent attempt to stab Martin. The BWC video shows that Jenkins' slashes were literally within a few inches of the officer at that point. Officer Blumenberg says he was in fear for Officer Martin's life. Officer Blumenberg says he was in fear for his own life as well, because he had fallen backward into a corner of the bedroom and had no place to go to avoid Jenkins. Officer Blumenberg says that

7

Jenkins was continuing to advance at Officer Martin and was trying to stab Officer Vrandenburgh as well, so he fired several more shots at Jenkins. Blumenberg says he was yelling at Jenkins the whole time to drop the weapon, but Jenkins did not do so. Blumenberg says Jenkins was on the bed at one point, but then suddenly rose up on the bed and came toward him (i.e., toward Blumenberg). He said that Jenkins got right up on him, and he had no choice but to defend himself from being killed, so he fired several more shot until Jenkins fell on the bed and was no longer a threat. Officer Timmons reported that Jenkins was almost on top of Officer Blumenberg by the time Blumenberg stopped firing.

Officer Blumenberg's BWC video makes it clear that, even after being tased and then shot several times, Jenkins lunged off the bed and came into contact distance from Blumenberg. Even if Jenkins had not had any weapon in his hands at that point in time, there was a considerable risk that he could have deflected and grabbed Blumenberg's service pistol, and used it against Blumenberg, the other officers, and Mrs. Jenkins.

Only about ten seconds after the last shot was fired, officers can be heard on the BWC audio saying, "Let's get him some medical help." Officer Blumenberg can be seen on his BWC video opening a tourniquet; he stated in his interview that he began looking for a place on Jenkins' body to possibly apply a tourniquet, but that he couldn't see very well because he had blood in his eyes. Several officers attempted to perform life-saving measures on Jenkins, and the officers continued CPR on Jenkins until EMS arrived and took over. Jenkins was taken by ambulance to the hospital, where he was pronounced dead. This civil lawsuit ensued.

Found on the bed near Jenkins was a wooden object, similar to a piece of dowel rod, with a blunt point on one end and a decorative red cardinal on the other end. It is clearly capable of being used to attack an individual's eye sockets. Also found nearby was the stag-handled pocketknife Jenkins had been opening and closing as he taunted the officers. When interviewed, Mrs. Jenkins told police that Jenkins had knives hidden all over the house. The pocketknife found at the scene is clearly a deadly weapon.

District Attorney General Neal Pinkston found no criminal wrongdoing on the part of any of the officers involved in this shooting.

Throughout the incident, Jenkins picked up and put down several objects, including what appeared to be a long, thin, pointed, black or dark-colored object he got from the closet in the adjacent bedroom, and a stag-handled pocketknife which he opened and closed repeatedly. From the BWC footage, it appears as if he may have put the black, pointed object down on the top of the dresser in the bedroom in which he was ultimately shot. During his encounter with the police, Jenkins repeatedly concealed his hands behind his back, or in his armpits by crossing his arms across his chest. Jenkins' behavior was similar to that of a carny running a shell game, in which the players have to try to keep track of which shell the pea is under. The difference from the carnival shell game is that an incorrect guess here could cost an officer his life. At times he tossed an object up into the air and then caught it. He also repeatedly hummed a taunt, like children use when teasing another child on the playground. Overall, his behavior, especially in an encounter with several police officers and a police K-9, could be described as bizarre, provocative, aggressive and threatening.

8

In total, based on the BWC video, Officer Blumenberg appears to have fired 6 shots at Jenkins from his Sig Sauer P320 9mm service pistol. Five fired 9mm cartridge cases, recovered at the scene, were submitted to the ballistics laboratory for testing. I note it sometimes happens that not all fired cartridge cases are recovered by police at the scene, for various reasons. I have worked in several such cases myself, including another case that is currently pending.

The autopsy showed that Jenkins was struck in the carotid artery, jugular vein, brachial artery and vein, right shoulder, upper right arm, right lung, left lung, heart, interior vena cava, stomach, small intestine, bladder, an entry wound in the front of the right thigh, and an entry wound in the upper right back. A Taser probe was embedded in the right anterolateral abdominal wall, with a Taser probe puncture in the right posterolateral chest wall. It appears that Officer Blumenberg was on Jenkins' right side when Blumenberg fired first his Taser, and then his handgun, at Jenkins. Stippling, reported in the autopsy around several of the gunshot entrance wounds, supports the statements of Officer Blumenberg and Officer Timmons that Jenkins was virtually on top of Blumenberg before Blumenberg finished firing.

The toxicology report showed that Mykel Jenkins had 22 times more than what would be considered to be a "therapeutic level" of methamphetamine in his system, and was in the "toxic" range for this substance. I expect a pharmacology expert will testify that this level of methamphetamine will likely cause an individual to exhibit "violent and irrational behavior."

### Discussion and Analysis

**Federal and Tennessee Standards for Police Use of Force.** Officer Martin used (or attempted to use) force when he delivered, or attempted, a front kick at Jenkins. Officer Blumenberg used force when he discharged his Taser twice at Jenkins, and he then used deadly force when he fired his service pistol at Jenkins.

I provide the following discussion of the applicable legal standards, not because I expect to testify as a legal expert or, in fact, expect to mention these statutory sections or legal cases at trial at all – which I do not -- but simply because in order to determine whether an officer's use of force is reasonable, it is necessary to know the use of force standards in which the officer has been trained. Accordingly, the discussion of these standards is provided here as a foundation for the use of force analysis and the discussion that follows.

Throughout the United States, police officers are taught that they are justified in using "objectively reasonable" force to defend themselves or others against what they reasonably believe to be an imminent threat of unlawful force.

In Tennessee, the legal justification for any individual to use non-deadly force in self-defense is contained in Tennessee Code Ann. 39-11-611 (2019), subsection (b)(2), and with specific regard to law enforcement officers in Tennessee Code Ann. 39-11-620 (2019), in subsection (a).

Tennessee Code Ann. 39-11-611 (2019) provides that a person:

9

… has no duty to retreat before threatening or using force against another person when and to the degree the person reasonably believes the force is immediately necessary to protect against the other's use or attempted use of unlawful force.

The above Code section, which would appear to apply to all individuals including law enforcement officers, allows reasonable non-deadly force to be used in self-defense.

Tennessee Code Ann. 39-11-620 (2019), which applies to the use of force by law enforcement officers in particular, provides:

> **(a)** A law enforcement officer, after giving notice of the officer's identity as such, may use or threaten to use force that is reasonably necessary to accomplish the arrest of an individual suspected of a criminal act who resists or flees from the arrest.
>
> **(b)** Notwithstanding subsection (a), the officer may use deadly force to effect an arrest only if all other means of apprehension have been exhausted or are unavailable, and where feasible, the officer has given notice of the officer's identity as such and given a warning that deadly force may be used unless resistance or flight ceases and:
>
> > **(1)** The officer has probable cause to believe the individual to be arrested has committed a felony involving the infliction or threatened infliction of serious bodily injury; or
> >
> > **(2)** The officer has probable cause to believe that the individual to be arrested poses a threat of serious bodily injury, either to the officer of to others unless immediately apprehended.

The use of force standards established by the Tennessee Code are in accordance with the landmark U.S. Supreme Court cases of *Tennessee v. Garner*, 471 U.S. 1 (1985) and *Graham v. Connor*, 490 U.S. 386 (1989), the principles of which are taught to police nationwide, including in Tennessee. These cases stand, among other things, for the proposition that a police officer may use objectively reasonable force to defend himself or others, or to control a subject who is being arrested, and may use deadly force when necessary to protect himself or others from an imminent threat of death or serious bodily injury. Being stabbed in the eye with a pointed object is clearly likely to cause serious bodily injury, and meet the definition of "deadly force" in most states, including Tennessee. Specifically, Tennessee Code Annotated, 39-11-106(34) defines "serious bodily injury" to include "bodily injury that involves … protracted loss or substantial impairment of a bodily member, organ, or mental ability." Clearly, being stabbed in one or both eyes with a pointed object would likely result in the protracted loss or substantial impairment of one's eyes, which are a bodily member.

10

To be justifiable under this over-arching federal standard, the officer's use of force must be "objectively reasonable" under the "totality of the circumstances" involved, as judged:

> … from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight …

*Graham v. Connor*, 490 U.S. 386 (1989). In *Graham*, the United States Supreme Court also stated:

> ... The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation.

Reducing this concept to what is perhaps its simplest form, the Supreme Court wrote in a case decided nearly sixty years before *Graham*, "[d]etached reflection cannot be demanded in the presence of an uplifted knife." *Brown v. United States*, 256 U.S. 335 (1921) (Oliver Wendell Holmes, J.).

The justification standards set out in *Garner v. Tennessee* and *Graham v. Connor*, and reflected in the Tennessee Code, are in turn represented in the CPD's written policy regarding use of force, which provides, in ADM-05 – USE OF FORCE:

### II. USE OF FORCE

A.   Officers of the Chattanooga Police Department shall use only the minimum level of force necessary to conduct lawful public safety activities and accomplish the mission of the department.  The level of force used by a police officer in any given situation is dependent on the level of resistance presented by the person with whom the officer is dealing.  An officer shall only use the minimum amount of physical force reasonably necessary to:

(1) protect persons and property and
(2) overcome any physical resistance offered by a person with whom the officer is dealing.  Under no circumstances shall the force used be greater than necessary to achieve lawful objectives.  Deadly force shall not be used unless the officer reasonably believes it is necessary to protect the officer or another person from imminent danger of death or serious physical injury. **[4.1.1, 4.1.2] (See *Tennessee v. Garner*, 471 U.S. 1 (1985) and TCA 39-11-620)**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

B.   Use of Non-Deadly Force

11

1.   Non-deadly force may be used in instances where a police officer reasonably believes it is immediately necessary to take physical action to: **[4.1.4]**

  a.   Preserve the peace;
  b.   Prevent the commission of an offense;
  c.   Make a lawful arrest; and/or
  d.   Prevent suicide, serious physical injury or death.

2.   Officers shall use only the minimum amount of force that is reasonably necessary to accomplish their lawful purpose. **[4.1.1.]**

I note that the bracketed, bold numbers throughout CPD ADM-05 are references to CALEA recommended use of force policy. Founded in 1979, CALEA, the Commission on Accreditation of Law Enforcement Agencies, is a highly-respected accrediting organization. CALEA standards and procedures are rigorous, and only slightly more than 5 percent of U.S. law enforcement agencies are CALEA-accredited. The Chattanooga Police Department is a CALEA-accredited agency.

**Officer Blumenberg's Use of the Taser.** Regarding Officer Blumenberg's use of the Taser (called a "CEW" or Conducted Electrical Weapon in ADM-05), the CPD use of force policy provides, in III.B.2.a.:

  a.   The CEW may be used when the following three criteria are all present:

      (1) Verbal commands have failed to bring about the subject's compliance.
      (2) Defensive Resistance has been exhibited by the subject.
      (3) Probable Cause has been established on the subject, or when the officer has a reasonable belief that a probable cause arrest is imminent. (PC must be established before the subject evades or resists.)

Clearly the ADM-05 criteria for Officer Blumenberg's use of the Taser had been more than met. Jenkins was creating a disturbance, was in violation of the conditions of his release, was apparently under the influence of a controlled substance, and had, in Officer Blumenberg's presence, threatened to put a weapon into both of Officer Martin's eyes. Numerous verbal requests and commands had failed to gain Jenkins' compliance. Jenkins had not only exhibited Defensive Resistance (defined in ADM-05 as "physical actions which attempt to prevent officer's control, which are non-threatening in nature"), but Active Aggression (defined in ADM-05 as "physical actions of assault which are threatening in nature"). Clearly there was probable cause to arrest Jenkins, and the use of the Taser was consistent with the CPD use of force policy as set out in ADM-05.

12

In widespread use by an estimated 90% of law enforcement agencies throughout the United States (including my own sheriff's office), the Taser can be deployed in either the "probe stun" mode or the "drive stun" mode. In the probe stun mode, the Taser uses compressed nitrogen to fire two small metal probes (darts), each with a small barbed point. If they strike the subject as intended, the probes stick into the subject's skin or clothing. Each probe is connected to the Taser itself by a very thin, insulated copper wire. The battery in the Taser sends an electrical charge down one wire to its probe, then across the subject's body to the other probe, and back along the second wire to the Taser, completing an electrical circuit. The hoped-for result is what the Taser manufacturer (originally, Taser International, and now Axon Corporation) calls "NMI," or neuromuscular incapacitation. In NMI, the electrical charge causes the muscles in the path of the electrical current to contract, causing not only pain, but an inability to use the muscles for voluntary muscular actions. Individuals who are standing up when affected by NMI from being tased typically stiffen and fall to the ground in an uncontrolled manner, much like a tree falling after having been cut off at it its base in logging.

When fired, the two Taser probes diverge from each other at an angle of 7 degrees for the most commonly-used Taser cartridges. Most law enforcement agencies use Taser cartridges with a 21-foot maximum range. At ranges of approximately 12-15 feet, the Taser probes have spread far enough apart that, provided they hit the subject, or the subject's clothing within 1.5 inches of the subject's body, the electrical circuit that is created will result in current passing through a long enough path in the subject's body for effective NMI to be caused.

The other manner in which the Taser can be used is by a so-called "drive stun" (or "touch stun"), in which two fixed electrodes at the front end of the Taser are pressed hard ("driven") against the subject. In this mode, the Taser probes and wires are not deployed, but the Taser functions much like a battery-powered "stun gun." Sometimes while lecturing to my police academy classes I have stunned myself in the leg, creating two electrode burn holes in my pants leg, but not stopping what I was saying to the class. The purpose of this is to demonstrate that the drive-stun effect is not incapacitating, and that a determined subject can simply ignore the pain created. In a drive stun, the electrical current only passes through that portion of the subject's body between the two Taser electrodes, which are less than an inch and a half apart in most Taser models. The result is not NMI, but simple pain compliance, and is typically not nearly as effective. A determined subject, or one who is affected by adrenaline, alcohol, or drugs, may be able simply to ignore the pain, and continue with his threatening actions.

The Taser is programmed to deliver five seconds of electrical current as a default setting, although the Taser user can stop the current sooner (by engaging the Taser's safety) or continue the current longer, by pressing the trigger again, as Officer Blumenberg did. Whether used in the probe-stun (NMI) mode or the drive stun mode, as soon as the Taser current stops, the subject is no longer affected, and can typically get to his feet (if he has fallen to the floor) and continue to fight. Because of this almost-immediate recovery, Taser/Axon teaches officers to "cuff under power" – that is, to control and apply handcuffs to the subject while the Taser current is still on, while the subject is incapacitated.

The likely reason that Officer Blumenberg's tasing of Jenkins was ineffective was that the confines of the relatively small bedroom did not allow enough distance for the Taser probes to

13

spread wide enough apart to create effective NMI. The result was that the short distance between the two Taser probes created what can be observed on the BWC video as a painful, but not incapacitating, result. Jenkins exhibited a pain reaction, but did not fall down, and was still able to come at the officers, making stabbing and slashing motions with his hands. The level of methamphetamine in Jenkins' system may also have contributed to his ability to function despite the pain. In addition, the location of the Taser probe hits, being in the side of Jenkins' torso, was not such as would likely affect his leg muscles, causing him to fall, or his arm muscles, preventing him from making the slashing and stabbing motions observed in the BWC video. This is because the electrical circuit, passing from one Taser probe to the other, did not pass through either Jenkins' legs or his arms. The result was much like a Taser drive stun, or the use of a conventional (non-Taser) "stun gun."

While it turned out to be ineffective and not incapacitating as intended, the use of the Taser on Jenkins was an objectively reasonable use of force, in keeping with widely-accepted law enforcement use of force standards, training, and CPD use of force policy. The simple fact that Jenkins had weapons in one or both hands that he refused to put down would justify the use of the Taser. Over tens of thousands of uses of the Taser by U.S. law enforcement agencies, in the vast majority of cases the Taser produces no lasting injury of any kind. The most common injuries, when any injury occurs, is "secondary injury" resulting from the subject falling to the ground when tased. In this case, any other non-deadly option available to the police would likely have resulted in greater injury to Jenkins, and more risk of serious injury to the police, than using the Taser. For instance, striking Jenkins with a baton would likely cause, at the least, contusions, and possibly broken bones or injured joints.

In fact, Taser International and Axon have both taught and recommended that the Taser should not be used against an immediate deadly threat. Taser/Axon teach that deadly force, i.e., the officer's gun, should be used to counter a deadly threat when possible. Given the close proximity of Jenkins to the officers, and the fact that Jenkins appeared or was reasonably believed to have pointed or edged weapons in one or both hands, Officer Blumenberg was taking a considerable risk in using the Taser against Jenkins, in what was clearly an attempt to take Jenkins into custody without causing any permanent physical harm to Jenkins. Unfortunately, this attempt did not work, and Jenkins' escalating attack on the officers required deadly force to be used.

**Use of Deadly Force Against Jenkins.** Regarding the use of deadly force to control a threatening subject, the CPD Use of Force Policy, ADM-05, provides, among other things, as follows:

> The use of deadly force is authorized when an officer reasonably believes that its use is necessary in order to stop an imminent threat of serious bodily harm or death against the officer or another person. **[4.1.1]**

An attack with an edged or pointed weapon such as the weapons possessed by Jenkins is a deadly force attack. For example, the FBI's Uniform Crime Reports (*Crime in the United States*, Table 8) year after year show approximately 1,500 to 1,600 murders per year in the

14

United States committed with knives and other cutting instruments. The actual numbers from years 2013 through 2019, for example, range from 1476 to 1632 homicides committed with knives and other cutting instruments, compared to some 6,000-7,000 homicides per year committed with handguns, the firearms most commonly used in criminal attacks.

The autopsy stated that Jenkins was 5'8" tall and weighed 166 pounds. The BWC videos showed that Jenkins was fast, coordinated, and generally physical capable of wielding a knife or pointed object with deadly effect. He opened and closed the pocketknife repeatedly during his encounter with the police, and repeatedly concealed it behind his back or in his armpits so that its open or closed status could not be observed. He threatened to "do" Officer Martin's eyes with the pointed object he had clenched in his hand in what is called, in knife-fighting circles, an "icepick grip." The specific details of the pointed object could not be known to the police, as they had no chance to inspect the pointed object as Jenkins stabbed and slashed with it, and then concealed it from view. The specific details, however, are relatively unimportant. For instance, almost any common ballpoint pen – even a BIC "stick pen" costing less than ten cents, can be thrust into an individual's eye sockets with blinding effect. An attacker can also plunge a ballpoint pen into a victim's abdomen, chest, kidneys, throat, temple or testicles. I once had an apparently deranged man, sitting next to me on a NYC subway train, threaten to put a ballpoint pen he was holding into my eye socket. It was a very palpable threat indeed. A stainless steel "Zebra" brand ballpoint pen I carry, which can be purchased in any Staples or most other office-supply stores, can be used to break a car window, and could be used as a formidable weapon against an individual. I am currently working as an expert in a case in which a prison inmate drove an ordinary sharpened wooden pencil into another inmate's thigh, so deep that it had to be surgically removed at the hospital. Various metal "tactical pens" are sold to law enforcement and military officers for use as weapons, or for breaking car windows and performing other emergency tasks.

The fact that Jenkins had not only already threatened Officer Martin with the pointed weapon, but had repeatedly failed to put the weapon down when asked, and then told, to do so by the police, was an indication that Jenkins either intended to use the weapon in fighting with the police, or at least that he wanted to maintain his ability to do so.

Although police recruits in the academy may be taught methods for attempting to take a knife away from a subject, they are almost universally taught that this is a desperate and extremely dangerous attempt, as the chances of being cut or stabbed in the process are considerable. Watching the BWC video of Jenkins slashing and stabbing, one can easily see the difficulty – perhaps impossibility – of an officer trying to take a knife or pointed weapon away from Jenkins during such an onslaught. An officer might possibly succeed, but the consequence of failing to do so could be that the officer is blinded,

It has been many decades since I have seen it taught that an appropriate response to a knife-wielding attacker might be the use of the officer's baton. This is because in order to come close enough to strike the attacker with his or her baton, an officer would be within a small fraction of a second of the attacker lunging forward to use his knife or pointed weapon against the officer. Accordingly, police throughout the United States are routinely taught that the standard response to a suspect attacking with an edged or pointed weapon at close range, such as the confines of the

15

bedroom in this case, is to use deadly force in the form of the officer's firearm. When Officer Blumenberg's Taser failed to incapacitate Jenkins, and Jenkins then lunged forward, stabbing and slashing at the officers, Blumenberg had no other reasonable option than to use his handgun to stop Jenkins.

Unlike the instantaneous effectiveness of a handgun shot often seen on television or in the movies, in real life shootings, handgun bullets often fail to incapacitate human subjects instantly. Unless the bullet hits a critical part of the central nervous system ("CNS"), such as the brain or cervical spine, handgun bullets typically incapacitate by causing blood loss. Just as a deer shot through the chest by a hunter will often run 75-100 yards or more before collapsing, a man shot in a non-CNS location can often remain mobile, aggressive, and life-threatening until he loses enough blood that his body is not maintaining an adequate flow of oxygenated blood through the brain to keep him conscious. See, e.g., *In Defense of Self and Others*, 3rd Edition, U. Patrick (FBI, ret.) and J. Hall (FBI, ret.), p. 118 ff., "Mechanics of Projectile Wounding," and sources cited therein.

In this case, Jenkins clearly posed an imminent threat of causing serious bodily harm or death to the officers. When shot, he fell back onto the bed, but then tried several times to get back up. In fact, the BWC video shows Jenkins, after being shot several times, rising up and lunging at Officer Blumenberg until Blumenberg fires the final shot. Officers are trained in situations such as this to continue firing until the threat is stopped. Here, it is apparent that Officer Blumenberg did not start by firing a continuous volley of shots, as he could have done. Instead, he fired, then waited to see whether or not Jenkins was incapacitated before firing again. The apparent attempt was not to cause Jenkins any greater injury than was necessary to stop the threat.

At one point in the BWC video, an officer can be heard to yell, "Drop the gun!" This may seem strange to a viewer unfamiliar with police use of force incidents. In actuality, the tremendously high stress of a deadly force attack such as that perpetrated by Jenkins is such that officers will sometimes say or do things which might appear strange when considered in the low-stress aftermath. One such "strange" behavior is for an officer to yell "Drop the gun!" when the officer can clearly see that the weapon in the attacker's hand is a knife or pointed weapon, not a gun. The officer is simply using "gun" to mean the suspect's weapon. I have seen this a number of times, and I have worked as an expert in a case here in Pennsylvania when a highly experienced police sergeant yelled "Drop the gun!" when the suspect was holding a knife, not a gun. The suspect replied, "What do you mean, drop the gun? Can't you see it's a f---ing knife?" When I debriefed him, the sergeant told me, "I don't know why I said "drop the gun." I could see it was a knife. "Gun" is just what came out of my mouth." In the present case, there is no indication that the officer's misnaming of Jenkins' weapon had any effect on what occurred.

**Police Attempts to De-Escalate the Situation.** The CPD officers who arrived at 3624 Premium Drive clearly attempted to de-escalate the situation, and made significant efforts to control Jenkins and take him into custody without using force that might harm him. Among other attempts at de-escalation:

- The officers started by speaking with Mrs. Jenkins to gain information on the situation, rather than just rushing in and using force against Jenkins.

- The officers went down the hall toward the bedrooms slowly, announcing themselves in advance to Jenkins rather than surprising him.

- The officers attempted to establish a rapport with Jenkins, speaking to him in normal voice tones rather than commands, and saying that if he would cooperate with them they would get help for him.

- One officer (Officer Martin, I believe) spoke with Jenkins, and made the requests and commands, so that Jenkins would not be confused by conflicting instructions from multiple officers.

- The officers pleaded with Jenkins, repeatedly asking him to put down the objects (weapons) in his hands.

- The officers called for backup officers, which is an attempt both to deter resistance by the subject, and to be able to control the subject physically without using a high level of force.

- The officers brought a K-9 within view, again an effort to deter resistance by the subject. However, the officers did not use the K-9 against Jenkins. Doing so would likely have resulted in injury to Jenkins (from a "bite and hold" K-9), in addition to which most agencies will not deploy a K-9 against a knife-wielding subject for fear that the subject will injury the K-9.

- Officer Blumenberg used his Taser, in an attempt to control Jenkins without injuring him.

- When the Taser deployment failed to control Jenkins, Officer Blumenberg fired his handgun at Jenkins only a shot or two at a time, to see if the threat posed by Jenkins could be stopped without the need to fire more shots.

- Officer Martin used one or more front kicks against Jenkins to try to keep him at a distance from him.

- Throughout Officer Blumenberg's firing at Jenkins, Blumenberg repeated commanded Jenkins to stop and to drop his weapon ("Put it down! Put it down!").

Throughout the incident, the CPD officers used the principle of "discretionary time" to try to de-escalate the situation and take Jenkins into custody without injuring him. It was only when Jenkins, who had repeatedly been seen to arm himself with various edged and pointed weapons, came at the officers in the confines of the bedroom, with a flurry of stabbing and slashing motions, that the officers had no reasonable option but to use deadly force.

17

## Concluding Opinions

I have stated many facts and presented many opinions throughout the foregoing report, all of which are accurate to a reasonable degree of professional certainty in my fields of expertise. This section on "Concluding Opinions" is intended to summarize the most significant of my opinions. However, I expect and intend that any or all of the facts and opinions I have stated throughout this report may be used in the trial of this matter, not just the Concluding Opinions in this section. That being said, my Concluding Opinions, to a reasonable degree of professional certainty in my fields of expertise, are as follows:

1. The tactics and use of force techniques used by Officer Blumenberg, both in tasing Mykel Jenkins and, when the Taser failed to be effective, in firing his service pistol at Jenkins, were consistent with widely accepted law enforcement training, practices, and use of force standards.

2. The use of force by Blumenberg was consistent with the training Blumenberg had received in his academy training, and in his training with the CPD.

3. The use of force by Blumenberg was consistent with the use of force policies of the CPD.

4. The use of force by Blumenberg was such as would be used by other reasonable officers on the scene under the totality of circumstances that existed in this incident.

5. The use of force by Officer Martin, in attempting one or more front kicks against Jenkins, was certainly not excessive force under the circumstances, and was consistent with widely accepted law enforcement training, practices, use of force standards, and CPD policies. If anything, the level of force used by Officer Martin was inadequate, in view of the threat being posed by Jenkins.

6. The CPD officers made reasonable, repeated and appropriate efforts to de-escalate the situation before using force, including calling for backup, approaching Jenkins' location slowly, speaking with Jenkins and attempting to develop a rapport, repeatedly offering to get help for Jenkins and repeatedly asking him to cooperate, appealing to Jenkins' feelings (if any) for his mother, bringing in but not using the K-9, ultimately pointing the Taser at Jenkins and ordering him to drop his weapon, and then attempting to control Jenkins by use of the Taser before finally resorting to use of the service pistol. In fact, the manner in which the pistol was used showed an attempt by Officer Blumenberg not to fire any more shots than were absolutely necessary to stop the deadly threat posed by Jenkins.

7. The CPD Use of Force Policy, ADM-05, is consistent with federal use of force standards for use in law enforcement as set forth in cases including *Graham v. Connor* and *Tennessee v. Garner*, discussed above. In fact, in requiring CPD officers to use "only the minimum amount of force which is reasonably necessary," ADM-05 is actually more restrictive than the federal standard, which is that "objectively reasonable force," which is not necessarily the "minimum amount of force," may justifiably be used.

18

I reserve the right to amend or supplement this report, and the facts and opinions contained herein, in the event additional information comes to my attention.

Very truly yours,

Emanuel Kapelsohn, President

19