March 4, 2023

I, John Daniel D.O., declare that the following statements reflect my expert opinions, to the highest degree of professional certainty. If called to testify in this matter, I will express the opinions contained in this report unless provided with materials that modify or change my opinions.

**Materials Reviewed:**

I have reviewed the files of Roger Dailey including:

- Deposition of Roger Dailey
- Deposition of Officers Roddy and Burns
- Tennova Shelbyville ER Medical Records
- Photos of Mr. Bailey and Diabetic sticker
- Officer audio files x 2
- Complaint of Mr. Bailey
- Use of force and Incident form
- Body cam Officer Thompson
- Dispatch Traffic
- General Orders Beford County Sheriff's Department

I reserve the right to supplement with any further materials tendered to me in the course of discovery.

**Experience:**

I have been in law enforcement since 1990. I have served as a reserve officer in multiple departments. I was Corrections Officer for three years. During that time, I worked as a housing officer, booking officer and a supervisory Senior Officer over thirteen deputies and 400 inmates, male and female, that had misdemeanor, felony, and federal charges and were already serving state and federal time. I was a SWAT and Patrol Officer for over two years. I oversaw jail medical at one of only two jails in the state of Tennessee that was accredited medically. I currently serve as a Constable in my county.

I started in medicine at the age of thirteen in a local rescue squad. I went to calls and took care of many different types of medical calls. By the age of seventeen I was the youngest emergency medical technician in the state. At seventeen I enlisted in the Army as a combat medic. I have been a certified nursing assistant and became a registered nurse. I worked all areas of the hospital, including working in a psychiatric hospital as a psych tech, becoming house supervisor, and serving as an on-call therapist. I then became a family nurse practitioner. I helped start with two other physicians the first hospitalist group in the state at multiple hospitals, some days seeing greater than thirty patients in the psychiatric, ICU, PCU, skilled nursing and rehab settings while admitting patients from other hospitals and the emergency room. I became a physician in 2008 but continued to work as a FNP hospitalist until after my first year of residency when I was fully licensed. I am an HBO physician and I have started a wound care clinic for a hospital. I currently have 42 years of military service and have multiple deployments as an internal medicine physician.

**Facts:**

The following facts are based upon my review of the available materials, including discovery responses and depositions.

On Tuesday November 24th, 2020 at approximately 5:30 P.M., Mr. Dailey was driving towards Shelbyville when his blood sugar suddenly dropped. Mr. Dailey, who is a diabetic, had accidentally taken his medicine twice earlier that afternoon. Mr. Dailey keeps a bag of candy in his car for circumstances just like this, and as he was driving and felt his blood sugar beginning to drop, he attempted to reach over to the passenger side of his vehicle to get a piece of candy, but the candy had fallen into the passenger side floorboard, and he could not reach it. Mr. Dailey did not see a good side of the road to pull over, such as a store, so he continued driving and attempted a few more times to reach over to the passenger side floorboard to retrieve the candy. Bedford County Sheriff's Department was notified of Mr. Dailey's erratic driving. Officer Thompson was the first to see Mr. Dailey driving and attempted to stop him. Mr. Dailey continued to drive as Deputy Burns arrived and "Shined his light" into Mr. Dailey's window causing him to slow to "5 miles per hour." Mr. Dailey's vehicle was then boxed in by deputies and LT Roddy along with Officer Burns end up pulling Mr. Dailey from the vehicle, putting him on the ground face down and cuffing him. In a brief discussion on audio, Officer Thompson begins questioning Mr. Dailey and per Officer Burns Incident report "Through prompt and thorough questioning" Officer Thompson noted Mr. Dailey's behavior was medical and "Diabetes." EMS had been summoned and at the scene a blood sugar check registered 25 and Mr. Dailey was given D50. Mr. Dailey was unhandcuffed and transported to the ER by EMS.

## OPINIONS:

Based on my experience and training as a Corrections and Law Enforcement officer, Physician and EMT who has also served in a Corrections Medical unit, the following Amendments/General Orders were violated and excessive use of force was applied:

### Violation of 4th and 14th Amendment with improper use of force:

It should have been clear to the responding officers that Mr. Dailey was impaired and incapacitated by something other than a typical DUI. At no point did Mr. Dailey have the cognitive ability to understand verbal commands or physical direction due to his low blood sugar. The lights and sirens (Heard in audio tapes while officers were yelling commands) only made it worse. When the door was opened and with the quick take down by the officers to the ground, Mr. Dailey would have had no control of his body or reflexes. Mr. Dailey's actions during the unlawful detention in no way would have risen to the point of active resistance. Officer Burns incident report only mentions that Mr. Dailey was unable to follow verbal commands while in the vehicle and only "resisted" while being face down on the ground and while the officers were applying handcuffs. Body cam of Officer Thompson shows two officers forcibly removing Mr. Dailey and upon take down to the ground a groan can be heard as well as him stating "Diabetic." Dispatch traffic audio - an officer states Mr. Dailey was incoherent and a diabetic. At no point in the video did Mr. Dailey resist and in fact remained still. Mr. Dailey could not set up on his own and was set up by the officers where he remained until the video cut off. When asked questions by the officers, Mr. Dailey answered yes and no loudly. Mr. Dailey had a diabetic sticker on his back window showing he was a diabetic just for occasions such as this. During the takedown, Mr. Dailey was subject to undue force and restraint. Mr. Dailey's handcuffs were not removed immediately by the officers when they realized this was a true medical situation and help him to get off the ground. In fact, the handcuffs were removed in the ambulance. Mr. Dailey's photos and ER record showed contusions to the face and a laceration above the left eyebrow. A CT scan on 12/9/20 shows the right anterior ribs 4-6 to be broken.

### *Violation of General Order #101 Oath of Office/Ethics*

This General Order establishes policy and guidelines to ensure that members of the Sheriff's Office, in the performance of their duties and responsibilities, are protective of the constitutional and legal rights of citizens.

4.1. As a Law Enforcement Officer, my fundamental duty is to serve mankind; to safeguard lives and property; to protect the innocent against deception, and the peaceful against violence or disorder; and to respect the Constitutional rights of all men to liberty, equality and justice.

**Anchoring had already been placed in the responding officers' minds. The call had been placed to dispatch that there was a car swerving and possible 10-49 driver. The officers' failed to make a proper judgment call at the scene when they came in contact with Mr. Dailey. They were all at the driver and passenger doors which could have been an officer safety issue if Mr. Dailey was a true threat. Mr. Dailey's top speed on Dispatch Traffic audio was 42 MPH and dropped to 32 MPH and eventually to 5 MPH. Mr. Dailey and his vehicle were controlled with a rolling stop.**

### *Violation of General Order #103 Rules of Conduct*

The purpose of this General Order is to establish rules of conduct that will provide a basis for the orderly and disciplined performance of duty, uphold the integrity of the agency, and maintain the respect and confidence of the public.

1.7. Employees shall be courteous in their dealings with the public and co-workers. In situations requiring police intervention, people often lose control of their emotions. Officers are expected to maintain calm control in enforcement efforts but are not expected to take physical or verbal abuse and may place appropriate charges against individuals who become threatening.

**This violation was evident by the inflection of the officers' voices and actions before and during the take down of Mr. Dailey. An officer in the video can be seen reaching into the vehicle with his weapon exposed to Mr. Dailey then looking out of the vehicle. That officer must not have felt Mr. Dailey was a threat and there were officers on the other side of the vehicle that could have been let in. Then two officers pull Mr. Dailey from the vehicle and take him down to the ground. An officer can be heard yelling an expletive while trying to get the handcuffs on.**

### *Violation of General Order #112 Use of Force and Weapons*

4. Officers shall allow individuals time to submit to arrest before force is used, wherever possible.

5. When feasible, officers should practice tactical repositioning, in an attempt to lessens the level of danger by moving to another location, increasing the distance between themselves and the suspect. By increasing the distance from the individual, an officer can greatly reduce the risk to their safety and can explore additional options before resorting to a use of force, not wish standing the need to control the threat to others.

B. Use of Force Authorization and Limitations

Officers of the Department are authorized to use only the amount of force necessary to accomplish lawful objectives. (See, Graham v. Conner, 490 US 388 (1989). Force may be used:

1. To effect an arrest or prevent the escape from custody of a person whom the officer reasonably believes has committed an offense. (See TCA 39-11-620)

2. To defend the officer or others from the use, or imminent use, of physical force.

3. To take persons into protective custody when authorized by law, such as persons who are a danger to themselves or others, persons incapacitated by alcohol, and/or runaway children.

4. To prevent someone from committing suicide or inflicting serious physical injury upon themselves.

5. To assist a licensed physician or psychologist in providing necessary medical treatment.

6. To control a situation, and to overcome passive or active resistance to a lawful order.

7. To neutralize an unlawful assault and defend themselves or others from harm.

The authorized use of physical force ends when resistance ceases and/or the officer has accomplished the purpose necessitating the use of force. Justification for the use of force is limited to the facts known or perceived by the officer at the time such force is used, including levels of resistance, suspect's behavioral cues, the number of officers and/or offenders present, and the availability of other options.

Force shall never be used to subject a person to torture and/or other cruel or inhumane or degrading treatment or punishment.

C. Verbal Warning

When tactically feasible, an officer will identify him/herself as a police officer and issue verbal commands and warnings prior to the use of force. When feasible, an officer will allow the subject an opportunity to comply with the officer's verbal commands. A verbal warning is not required in circumstances where the officer has to make a split-second decision, or if the officer reasonably believes that issuing the warning would place the safety of the officer or others in jeopardy. (See TCA 39-11-620).

**Mr. Dailey needed extra time and direction due to his hypoglycemia. It is obvious from the video Mr. Dailey was not a threat. He was "Incoherent" even by the officer's own admission. The officer prior to removing Mr. Dailey was inside the vehicle in Mr. Dailey's face. The vehicle was stopped by the rolling road block and Mr. Dailey was not attempting to injure the officers nor leave. Officers were at the passenger door that could have been let in. In section B. Use of Force Authorization and Limitations, Mr. Dailey met none of the authorized uses of force in order to accomplish a lawful objective as described in case law and departmental policy.**

G. Rendering Medical Aid

1. Any time a person has visible injuries or complains of being injured as a result of force used against him/her by an officer, the officer must take appropriate actions to provide medical care for the injured person. This includes providing first aid, requesting emergency medical services, and/or arranging for other transportation to a hospital or emergency medical facility.

2. Officers trained in proper treatment procedures for persons exposed to chemical sprays and the effects of other non-deadly force shall render appropriate medical aid. If the person is offered and/or refuses treatment, this refusal shall be recorded in the police report, along with all relevant information. In addition, the officer will also notify their supervisor as soon as practical. If warranted, the supervisor will arrange to have photographs taken of the person's injuries and those photographs will be attached to the report.

*Failure to render aid:*

Upon realization that Mr. Dailey was in distress, the officers were duty bound to render as much aid as possible. Mr. Dailey should have been immediately unhandcuffed. Instead, the officers left Mr. Dailey setting there on the road and handcuffed in the cold. Officers never attempted to place him in a warm cruiser, offer a jacket or assess any needs Mr. Dailey could articulate that they could render.

I hold these opinions to a reasonable degree of certainty in the fields of law enforcement and in emergency medical services.

_____
JOHN DANIEL, D.O.

_____
Date

2. Officers trained in proper treatment procedures for persons exposed to chemical sprays and the effects of other non-deadly force shall render appropriate medical aid. If the person is offered and/or refuses treatment, this refusal shall be recorded in the police report, along with all relevant information. In addition, the officer will also notify their supervisor as soon as practical. If warranted, the supervisor will arrange to have photographs taken of the person's injuries and those photographs will be attached to the report.

*Failure to render aid:*

Upon realization that Mr. Dailey was in distress, the officers were duty bound to render as much aid as possible. Mr. Dailey should have been immediately unhandcuffed. Instead, the officers left Mr. Dailey setting there on the road and handcuffed in the cold. Officers never attempted to place him in a warm cruiser, offer a jacket or assess any needs Mr. Dailey could articulate that they could render.

I hold these opinions to a reasonable degree of certainty in the fields of law enforcement and in emergency medical services.

_____
JOHN DANIEL, D.O.

_____
3/7/23
Date