March 26, 2023

    I, John Daniel D.O., declare that the following statements reflect my expert opinions, to the highest degree of professional certainty. If called to testify in this matter, I will express the opinions contained in this report unless provided with materials that modify or change my opinions.

**Materials Reviewed:**

I have reviewed the files of Mykel Jenkins including:

- Postmortem Examination
- Chattanooga Professional Standards Division report
- Chattanooga Police Department Use of Force policy
- 2022 Inservice training slides Use of force/Excited Delirium protocol/De-escalation/Fail to render aid/Fail to Intervene/Positional Asphyxia/Officer Conduct
- Inservice 2021 Use of Force training slides/Police Performance/Response to Resistance/Use of Force Report
- Body cam video three responding Officers
- Chattanooga Police Firearm Discharge Report
- Chattanooga Police Incident Report arrest of Mr. Jenkins 03/02/21
- Hamilton County Sheriff's Office shooting investigation reports.
- City of Chattanooga's responses to plaintiff's first set of Interrogatories
- Plaintiff Amended Complaint
- Chattanooga Police Internal Affairs investigation report

    I reserve the right to supplement with any further materials tendered to me in the course of discovery.

**Experience:**

    I have been in law enforcement since 1990. I have served as a reserve officer in multiple departments. I was Corrections Officer for three years. During that time, I worked as a housing officer, booking officer and a supervisory Senior Officer over thirteen deputies and 400 inmates, male and female, that had misdemeanor, felony, and federal charges and were already serving state and federal time. I was a SWAT and Patrol Officer for over two years. I oversaw jail medical at one of only two jails in the state of Tennessee that was accredited medically. I currently serve as a Constable in my county.

    I started in medicine at the age of thirteen in a local rescue squad. I went to calls and took care of many different types of medical calls. By the age of seventeen I was the youngest emergency medical technician in the state. At seventeen I enlisted in the Army as a combat medic. I have been a certified nursing assistant and became a registered nurse. I worked all areas of the hospital, including working in a psychiatric hospital as a psych tech, becoming house supervisor, and serving as an on-call therapist. I then became a family nurse practitioner. I helped start with two other physicians the first hospitalist group in the state at multiple hospitals, some days seeing greater than thirty patients in the psychiatric, ICU, PCU, skilled nursing and rehab settings while admitting patients from other hospitals and the emergency room. I became a physician in 2008 but continued to work as a FNP hospitalist until after my first year of residency when I was fully licensed. I am an HBO physician and I have started a wound care clinic for a hospital. I currently have 42 years of military service and have multiple deployments as an internal medicine physician.

**Facts:**

The following facts are based upon my review of the available materials, including discovery responses and video.

On Friday 03/19/2021 at 10:14 hours, Officers were dispatched to 3624 Premium Drive on a disorder/mental health call. Officers Blumenberg and Martin arrive and make contact with the victim's mother. They speak in the living room and walk through the hallway to two back bedrooms. They do not make immediate contact with Mr. Jenkins and Officer Martin appears on video to go to the kitchen area only to move back to the bedrooms where Officer Blumenberg has made contact with Mr. Jenkins. In the video it is clearly evident that Mr. Jenkins is on something as evidence by his constant walking, rambling, and moving things in the room. Mr. Jenkins is able to tell them and spell his name. The Officers attempt to get Mr. Jenkins to go to the hospital but he refuses. Mr. Jenkins has not slept all night. During this period, Ms. Jenkins again informs the officers that Mykel had signed papers at the jail "Not to come to the house." Officer Martin goes to the living room and radios dispatch to check for papers on Mr. Jenkins. Then Officer Martin goes to his vehicle and gets a call from dispatch that there is an order of protection on Mr. Jenkins for that residence and Ms. Jenkins is the Complainant. Officer Martin goes back inside the home where he makes contact with Ms. Jenkins and Officer Blumenberg in the Living room. During this time Mr. Jenkins has been freely roaming in the home. Back is called for and Officer Blumenberg makes multiple statements that Mr. Jenkins "Will fight." Two K9 officers arrive and they all proceed down the hallway to the right back bedroom where Mr. Jenkins has moved to. Officer Blumenberg moves into the room and Officer Martin follows. They try talking to Mr. Jenkins who is picking up various objects and putting them down while at times telling the officers what he has in his hand. Two times Mr. Jenkins gets in Officer Martin's face and Officer martin stands face to face with him without any enhanced readiness to defend himself. At one point the K9 Officer leaves and returns with his dog. Mr. Jenkins hears the dog and moves to the doorway trying to talk to the dog. At that time Officer Blumenberg deploys his Taser and Mr. Jenkins falls back toward the back side of the bedroom. Officer Martin seems to attempt to go toward Mr. Jenkins but the Taser has warned off and Mr. Jenkins appears to be making dog type sounds and moving back toward Officer Martin while moving his arms. Officer Blumenberg can be seen falling over the edge of the bed while trying to back pedal and falls toward the back of the bedroom corner facing the hallway. A "Pop" is heard as Officer Martin is moving out of the room thru the doorway into the hall with another officer right behind him. In the video it appears that Mr. Jenkins is shot with blood exiting his body and he lands on the middle of the bed yelling "You shot me." An Officer that was standing in the adjoining bedroom door appears to reach for Mr. Martin at the bed when another shot is heard and that Officer retreats to the doorway. Several more shots and yelling are heard until a video shot shows Officer Bloomberg coming toward the doorway and Mr. Jenkins is lying still on the bed.

**OPINIONS:**

**Based on my experience and training as a Corrections and Law Enforcement officer, Physician and EMT who has also served in a Corrections Medical unit, the following Police Training was violated and excessive use of force was applied:**

Inservice training slides on pg. 44 Excited Delirium protocol step #2 – quickly and safely control the person. Use multiple officer takedown, verbal commands and body cams. Pg. 88Use of Force- use distance and time to decrease spontaneous assaults. Pg. 92- Tactics- In the end it is your safety, safety of others and complete the mission. There is more than one way to solve the problem. Pg. 93- Try another tactic if not working. Pg. 94- Do not be so quick to rush in without a tactic to complete the mission. Pg. 98- Physical application- penetrate or disengage.

Video shows that the actions of Officers all the above training was disregarded. Officer Blumenberg the ranking Officer should have given direction to the other Officers thru out the process of attempting to take Mr. Jenkins into custody. Mr. Jenkins was at the end of the hallway in a bedroom. When Officer Blumenberg and Officer Martin made contact the first time with Mr. Jenkins in the bedroom to the left, with his actions they should have known that he was under the influence of something and that agitation would be easily induced. Officer Martin should have only stayed in the hallway to radio dispatch while being close to his partner in case of escalation keeping Mr. Jenkins contained. Instead, Officer Martin ends up outside in his vehicle. When he realizes that there is a valid order of protection he moves back inside only to find Officer Blumenberg and Ms. Jenkins back in the living room leaving Mr. Jenkins to roam freely. Officer Blumenberg and Officer Martin are casually standing there with Officer Blumenberg's hands in his pockets standing directly in front of the hallway awaiting back up. Neither Officer conducted a sweep to search for weapons but broke contact and containment of Mr. Jenkins. During the first encounter, Mr. Jenkins was answering questions and spelled his name for the officers. Backup was called and while all four officers were in the living room together the ranking officer should have informed all what kind of layout there was, the condition of Mr. Jenkins and tactics to be used for arrest. Instead, all that was relayed was "He is gonna wanna fight." Officer Blumenberg positions himself in a corner of the back bedroom with no escape and Officer Martin stays close to the doorway of the bedroom yet when Mr. Jenkins approached Officer Martin twice, Officer Martin stood face to face with him and did not take a defensive position or attempt to use any type of force to protect himself or other officers (which he was cited by the professional board review for those non actions). Mr. Jenkins was telling the officers what he had in his hands when he was picking up stuff and sometimes setting them down. At one point he states he has batteries and a pen just prior to the start of the physical force. A K9 officer goes out and brings in the dog yet never releases it even after Mr. Jenkins was tased. Later the K9 Officer was heard in the video stating, "I did not release the dog because it was a mental patient." During the event, Officer Blumenberg can be seen back pedaling and tripping over the corner of the bed falling to the floor with his Taser in hand while Officer Martin is seen backing out of the room with a third officer attempting to lay hands on Mr. Jenkins at the corner of the bed when a shot is fired causing the third officer to back out of the room. Mr. Jenkins lays down in the middle of the bed and states, "You shot me." No officer came into the room to attempt to subdue Mr. Jenkins while Officer Blumenberg had him covered. Instead, Mr. Jenkins gets up and starts moving toward Officer Blumenberg who is still toward the back corner of the bedroom. Officer Blumenberg could have moved to the doorway with the other officers but did not. A total of six shots were fired. During the event no directions were given by any Officer to the other Officers other than someone stated, "Go get the dog." The Officers had plenty of time and distance and could have called in SWAT if they were unsure of how to handle the situation. There is even a protocol to have EMS there on standby for immediate sedation.

Based on my experience and training as a Corrections and Law Enforcement officer, Physician and EMT who has also served in a Corrections Medical unit, the following General Orders were violated and excessive use of force was applied:

**Chattanooga Police Department - Policy Manual**
**ADM-05 – USE OF FORCE**
**Amends/Supersedes:** ADM-5 (3/26/18) **Reviewed:** Annually/February **Date of Issue:** 02/11/19
**CALEA 4.1.1-4.2.3; 4.3.2, 4.3.3 & 4.3.4 (6th Ed.)**

## II. USE OF FORCE

A. Officers of the Chattanooga Police Department shall use only the minimum level of force necessary to
conduct lawful public safety activities and accomplish the mission of the department.

C. Use of Non-Deadly Force

1. Non-deadly force may be used in instances where a police officer reasonably believes it is immediately
necessary to take physical action to: **[4.1.4]**
a. Preserve the peace;
b. Prevent the commission of an offense;
c. Make a lawful arrest; and/or
d. Prevent suicide, serious physical injury or death.

2. Officers shall use only the minimal amount of force that is reasonably necessary to accomplish their lawful purpose. **[4.1.1]**

   Officers had Multiple Officers, Time and Distance that could have been applied on their side but instead of revamping their tactic they chose to go forward resulting in the death of Mr. Jenkins.

4. The chart below is based on the concept of increasing and decreasing the police officer's level of control in response to the level of resistance offered by the suspect or violator and depicts the escalation/ de-escalation of an officer's responses to the suspect's or violator's compliance or non-compliance to the officer's presence, directions or actions:

**Individual's Actions Officer's Responses**
Psychological Intimidation Officer Presence
Verbal Non-Compliance Verbal Direction
Passive Resistance Soft Empty Hand Control
Defensive Resistance Hard Empty Hand Control
Active Aggression Intermediate Weapons (Includes Canine)

   A canine was present but was not deployed.

I hold these opinions to a reasonable degree of certainty in the fields of law enforcement and in emergency medical services.

JOHN DANIEL, D.O.

5/26/18
Date